UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:10-cv-23685 JAL-LENARD/O'SULLIVAN

THE PALM BAY YACHT CLUB
CONDOMINIUM ASSOCIATION, INC.,

      Plaintiff,

vs.

QBE INSURANCE CORPORATION,

      Defendant.

**PLAINTIFF'S RESPONSE AND INCORPORATED MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING PAUL NORCIA**

Plaintiff, Palm Bay Yacht Club Condominium Association, Inc. ("Palm Bay"), through its undersigned counsel, for its Response and Memorandum of Law in Opposition to Defendant's, QBE Insurance Corporation ("QBE"), Motion in Limine Regarding Paul Norcia, states as follows:

## I. INTRODUCTION

The present action comes before this court on Palm Bay's breach of insurance contract action against QBE arising from windstorm damage after Hurricane Wilma. Following notice of the loss, QBE conducted an investigation, determined there was coverage for the loss, but declined to make a payment for the loss because the damage purportedly did not exceed the insurance policy's deductible. Disagreeing with QBE's assessment of the loss, Palm Bay commenced this breach of contract action.

On June 27, 2011, Palm Bay timely served its expert disclosures, which included a written report and two estimates prepared by Paul Norcia. (*See* Norcia's Expert Report at D.E. 59-3). Palm Bay retained the services of Mr. Norcia to estimate the replacement cost value and

1

actual cash value of the loss and damage sustained at the Palm Bay property resulting from Hurricane Wilma.

QBE moves *in limine* to preclude and/or to limit Mr. Norcia from offering expert opinion testimony as to causation as well as opinion testimony about whether certain building items can be repaired or replaced. In the alternative, QBE requests a *Daubert* hearing. As set forth herein, Mr. Norcia is qualified as an expert witness based upon his extensive background, training and experience in evaluating property insurance losses. Moreover, his methodology in evaluating hurricane losses is reliable, as it is the same methodology applied by QBE's insurance adjusters when they evaluate property damage losses such as a hurricane. Furthermore, because it is based on training and experience not possessed by the ordinary person, Mr. Norcia's testimony will assist the trier of fact. As such, Mr. Norcia's opinions should be permitted at trial and any criticism of his lack of expertise should be addressed during "vigorous cross examination". Accordingly, there exists no basis for a *Daubert* hearing. QBE's motion should therefore be denied.

## II. ARGUMENT

### A. Standards Governing Motions *In Limine*

A motion *in limine* only seeks to exclude anticipated prejudicial evidence before it is offered, not to determine the sufficiency of the evidence or the merits of an issue. *Soliday v. 7-Eleven, Inc.,* 2011 WL 1837807 at *1 (M.D. Fla. April 20, 2011) *citing Luce v. United States,* 460 U.S. 38, 40 n. 2 (1984). The real purpose of a motion *in limine* is to give the trial judge notice of the movant's position so as to avoid the introduction of damaging evidence which may irretrievably effect the fairness of the trial. *Stewart v. Hooters of America, Inc.,* No. 8:04-cv-40-T-17-MAP, at *1 (M.D. Fla. June 18, 2007) (*citing Luce,* 460 U.S. at 41). A court has the power

to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. *Id.* Therefore, if evidence is not clearly inadmissible, evidentiary rulings must be deferred until trial to allow questions of foundation, relevancy, and potential prejudice to be resolved in context. *Hawthorne Partners v. AT&T Technologies,* 831 F. Supp. 1398, 1401 (N.D. Ill. 1993).

### B. Standards Governing the Admissibility of Expert Testimony

Expert testimony in federal courts is governed primarily by Federal Rules of Evidence 702, 703 and 704:

Rule 702 provides as follows:

> "A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 703 provides as follows:

> "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the

jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

Rule 704 provides as follows:

"**(a) In General – Not Automatically Objectionable.** An opinion is not objectionable because it embraces an ultimate issue.

**(b) Exception.** In criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime or of a defense. Those matters are for the trier of fact alone." (Emphasis is original.) Fed. R. Evid. 704.

In determining the admissibility of expert testimony under Rule 702, a trial court must conduct a three-part inquiry considering whether: (1) the witness is qualified to testify competently; (2) the methodology by which the expert reaches his opinions and conclusions is sufficiently reliable, and; (3) the testimony will assist the trier of fact. *Club Car, Inc. v. Club Car (Quebec) Imp., Inc.,* 362 F. 3d 775, 780 (11th Cir. 2004). *See also Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1107 (11th Cir. 2005); *Kilpatrick v. Berg, Inc.,* 613 F. 3d 1329, 1335 (11th Cir. 2010); *United States v. Hansen,* 262 F. 3d 1217, 1234 (11th Cir. 2004). The court's inquiry into an expert is a flexible one, focusing on multiple factors. *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 594 (1993).

Here, Mr. Norcia is qualified to offer expert opinion testimony about property insurance loss valuation, based upon the knowledge, skill, training, and education he has acquired over the past 26-plus years in the property insurance industry. The methodology he followed to reach his opinions and conclusions is sufficiently reliable, and is corroborated by insurance estimators, appraisers and adjusters who work for QBE. Moreover, his specialized knowledge will assist the trier of fact in understanding the evidence and in determining in the replacement cost value and the actual cash value of the Palm Bay Hurricane Wilma loss.

1. **Mr. Norcia's Is Qualified To Testify Competently On The Valuation Of Property Insurance Losses.**

The threshold requirement for the admissibility of expert testimony under Rule 702 is the expert witness be qualified to testify competently on the subject matter. Rule 702 provides that a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. An expert may be qualified on the basis of experience alone. Fed. R. Evid. 702, advisory committee's note (2000); *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004). *See also Century Indem. Co. v. Aero-Motive Co.,* 254 F. Supp. 2d 670 (W.D. Mich. 2003).

The relevant factors for determining reliability vary from case to case. *See* Fed. R. Evid. 702, advisory committee's note (2000); *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) ("Exactly how reliability is evaluated may vary from case to case."); *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire*, 526 U.S. at 150) ("Whether the *Daubert* opinion factors are even pertinent to assessing reliability in a given case will 'depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'"); *Century Indemnity Company v. Aero-Motive,* 254 F. Supp. 2d 670 (W.D. Mich. 2003) ("The Court concludes that the *Daubert* factors are not helpful in assessing reliability in this case because Talley's opinions, which are based upon his experience in reconstructing lost insurance policies, are not the type of opinions that can be tested for verified or subjected to peer review."). As the advisory committee's note accompanying the 2000 amendment to Rule 702 explains, "[s]ome types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than other. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed. R. Evid.

702, advisory committee's note (2000).  As such, district courts are afforded substantial discretion in deciding how to test whether an expert's opinion is reliable and whether it is, in fact, reliable. *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999).

Mr. Norcia is unequivocally qualified to offer expert opinion testimony on the subject of property insurance loss valuation.  In that regard, Mr. Norcia was recently qualified as an expert on the subject of property insurance loss valuation in the matter of *Ocean View Towers Association, Inc. v. QBE Insurance Corp.,* Case No. 11-60447-CIV-SCOLA.  (A copy of Mr. Norcia's direct-examination testimony from the *Ocean View* trial is attached as Exhibit A). During his direct examination, Mr. Norcia discussed his extensive background, training and experience.  Mr. Norcia has 26-plus years of experience as an independent insurance adjuster, a public insurance adjuster, a property valuation estimator, a property valuation appraiser, and an umpire in property loss appraisals.[1]  During six of the 21 years he was employed in the property insurance industry as an independent estimated adjuster, he provided adjusting services for QBE in the State of Minnesota.  Mr. Norcia has adjusted, supervised, and/or managed over 15,000 insurance losses during his career, including working large hurricane claims.  (*See Ocean View* Norcia Trial Testimony at pp. 88:6-93:13; Norcia's Expert Report; and Norcia's Curriculum Vitae and Testimony List, attached as Exhibit B).

The question of whether an insurance adjuster qualifies as an expert witness was address in *Vision I Homeowners Association, Inc. v. Aspen Specialty Ins. Co.,* 674 F. Supp. 2d 1321 (S.D. Fla. 2009).  In that case, the insured brought an action against its property insurer seeking damages related to Hurricane Katrina.  The insurer assigned Mark Phillips as an independent adjuster to inspect the property.  Eventually, Phillips left his employ as an independent adjuster

---

[1] An independent adjuster is not an employee of an insurance company, but performs adjusting services on behalf of insurance companies.  A public adjuster performs adjusting services on behalf of policyholders.

and was retained as an expert witness on behalf of the insured to offer expert testimony as to wind and water damages sustained to the insured property.  The insurer argued that Phillips should be excluded as an expert because he did not have the requisite expertise in meteorology or engineering.  The district court concluded that Phillips' background as a licensed independent insurance adjuster who had handled over 400 insurance claims gave him the requisite experience, training, and instruction to adjust losses under insurance contracts.  In concluding that Phillips was deemed qualified to offer expert opinion testimony on wind and water damage to property from a hurricane, the court noted that any weaknesses in the underpinnings of the expert's opinion go to its "weight" rather than its admissibility, and would properly be the subject of cross-examination.

Similarly, in *Century Indemnity Company v. Aero-Motive,* 254 F. Supp. 2d 670 (W.D. Mich. 2003), the district court was faced with determining whether an expert witness on reconstruction of lost insurance policies could offer opinion testimony at the time of trial.  There, the insurer argued that the insured's purported expert, Douglas Talley, was not qualified to render opinions relating to the reconstruction of lost insurance policies because Talley had not been employed in the insurance industry and had no insurance degrees or designations.  The insured, in response, argued that Talley was qualified to offer opinion testimony based upon his significant experience in commercial insurance underwriting practices and policy reconstruction services.  In evaluating Talley's experience, the district court noted that his testimony was not necessarily that type which can be testified or verified; but, rather was based upon his own experience, experience not possessed by the ordinary person.  As such, the court concluded that Talley could offer expert opinion testimony, noting that such testimony would assist the trier of fact.  *See also Chalfonte Condominium Apartment Association, Inc. v. QBE Ins. Co.,* No. 9:06-

7

cv-81046-DMM (S.D. Fla. July 30, 2007) (allowing public adjuster to testify at trial based upon experience in the field); *Geico Cas. Co. v. Beauford,* No. 8:05-cv-697-T-24EAJ, 2007 WL 2412974 (M.D. Fla. August 21, 2007) (witnesses' extensive education, training and thirty years of claims handling experience qualified her to testify as an expert).

Like the insurance experts in *Vision I* and *Aero-Motive,* Mr. Norcia also has the requisite knowledge, skill, training, experience and education to offer opinion testimony in this matter. Mr. Norcia's vast experience in insurance matters has qualified him to offer expert opinion testimony about property insurance loss valuation, which includes determining whether a building component can or should be repaired or replaced and whether observed damage was caused by a wind event like a hurricane. (*See Ocean View* Norcia Trial Testimony at pp. 94:4-18; 98:11-99:23). The specialized knowledge, skill, training, experience, and education he has acquired over the past 26-plus years regarding property insurance loss valuation will assist the trier of fact to understand the evidence and to determine the replacement cost value and the actual cash value of the Palm Bay Hurricane Wilma loss.

### 2. Mr. Norcia's Loss Valuation Methodology Is Sufficiently Reliable And, In Fact, Is The Same Methodology Applied By QBE's Insurance Adjusters.

Despite his extensive background, training, and experience in property insurance loss evaluation, QBE argues that Mr. Norcia is unqualified to offer opinion testimony regarding whether a particular component of a building can be repaired or replaced and whether observed damage was caused by a wind event like a hurricane. QBE's primary criticism of Mr. Norcia is that he is unqualified to offer such opinion testimony because he does not have expertise in particular trades such as glazing, roofing, and HVAC systems. The flaw with QBE's argument is that the process by which Mr. Norcia has determined whether a building item needs to be

repaired or replaced and whether a building item was damaged by a wind event like a hurricane is exactly the same process by which QBE's own adjusters evaluate a property damage loss.

In it is undisputed that Sanford Siegel, QBE's adjuster in this case, has no background, training or experience in glazing, window installation, window design, stucco, stucco, and/or engineering. (*See* Siegel Dep. at pp. 18-20, attached as Exhibit C. *See* also *Bay Park Towers* Dep. at pp.16-17, attached as Exhibit D). Notwithstanding this lack of experience, QBE has deemed Mr. Siegel qualified to "adjust" commercial property insurance claims, and assigned him to adjust the Palm Bay claim. (*See* Siegel Dep. at p. 73). According to Mr. Siegel, adjusting a commercial property insurance claim includes evaluating damage to buildings and business personal property and preparing estimates. (Siegel Deposition at pp. 14-15). Mr. Siegel admitted during his deposition that his background, training and experience allows him to look at a particular property and assess conditions and damages which may or may not be related to a hurricane. (Siegel Deposition at pp. 71-72). Despite his lack of professional training in glazing, roofing, stucco and/or engineering, QBE believes Siegel is nonetheless qualified to offer an opinion as to the need to replace or repair an item and assign a value to that item. (*See* Siegel Deposition Exhibit 7, attached as Exhibit E). This process is exactly the same process that Mr. Norcia applies.

As previously discussed, Mr. Norcia was qualified as an expert witness in the *Ocean View* matter. Mr. Norcia was allowed to offer opinion testimony on the same exact issues that QBE says he is not qualified to render an opinion on. At trial, Mr. Norcia discussed not only his extensive background and training, but also the methodology he uses in evaluating a property insurance loss, such as a hurricane to a condominium building. Mr. Norcia testified that over the

course of his career he developed a methodology for investigating, estimating, and/or adjusting a hurricane loss. He summarized his methodology as follows:

> "A: Again, it is getting in contact with the insured, visiting the location. As you visit the location, you want to do a thorough review of both the exterior of the building, the interior of the building. You want to get into as many units as you can to review the damages.
>
> You photograph damages, sometimes you might photograph items that aren't damaged. You measure items. You measure the roof. You measure the perimeter of the building. You measure units. You measure windows. You measure hallways. You take photographs of that. You compile all this data and field notes. You compile the data and the photographs. At that point you would compile an estimate based on your observations and your review.
>
> In addition to that, you would talk to as many of the unit owners as you could, board members, property managers. You would ask them for documentation as it relates to maybe their expenses or items that they have done following, or immediately following the hurricane or up through the repair process.
>
> At that point you really gather all that information. You would input it into not only Xactimate estimate I discussed earlier, but also a report and recommendation to, say, in this case I am making a report and recommendation to the association." (*Ocean View Norcia* Trial Testimony at pp. 108:12-109:9).
>
> \* \* \*
>
> "Q. So your methodology would encompass, number one, inspecting the property?
>
> A. Absolutely.
>
> Q. Number two, it would encompass measuring the exterior as well as the interior units of the property?
> A. Yes.
> Q. You would photograph the property?
> A. Yes.
> Q. You would gather information from various people such as the property manager, board directors, unit owners?
> A. Yes.
> Q. You would gather documents concerning any actual cost incurred for repair or replacement incurred to date?

> A. Yes.
> Q. What about consulting with experts; would you consult with any experts at that point in time?
> A. If I felt something was needed to support what it was I was looking at, I would certainly make a recommendation to the client as to whether or not an expert might be needed to support my findings.
> Q. What about reviewing the actual insurance policy?
> A. That is always important. That is something typically that I do after I have inspected the damages and get an impression as to how those damages fit with the policy.
> Q. After that is done, you would prepare your estimate?
> A. Correct.
> Q. And that is the methodology you have followed since 1985, when you were involved in estimating, investigating and/or adjusting a hurricane loss to a condominium property such as Ocean View Towers?
> A. Correct, and it remains the same today so –." (*Ocean View* Norcia Trial Testimony at pp. 109:18-110:23).

Mr. Norcia further testified during the *Ocean View* trial that in connection with arriving at a replacement cost value number for the different categories set forth in his estimate, he is required to exercise professional judgment as to the scope of damage i.e., whether a certain building component needs to be repaired versus replaced. (*Ocean View* Norcia Trial Testimony at p. 130:5-131:3). The criteria he follows is whether a repair can be done feasibly, economically, and properly. (*Ocean View* Norcia Trial Testimony at pp. 98:11-99:23). In regards to rendering an opinion as to whether a window needs to be repaired or replaced, Mr. Norcia testified that he would base such a determination on not only the expert reports, but also based on his "own observation" and "past experience" in dealing with similar condominium associations. (*Ocean View* Norcia Trial Testimony at p. 130:19-24).

At the *Ocean View* trial, QBE called Robert Sansone, an independent adjuster with more than 30 years of experience in adjusting property insurance claims. He testified as follows:

> "Q. Sir, do you have any general contracting background, training or experience?

11

> A. No, just on-the-job with contractors on claims.
> Q. Sure. Do you have any engineering background, training or experience?
> A. No, just on-the-job with engineers.
> Q. Do you have any roofing background, training or experience?
> A. No.
> Q. Do you have any glazing background, training or experience?
> A. No.
> Q. Do you have any training in the application of stucco?
> A. No.
> Q. Do you have any heating, ventilation or air conditioning equipment background, training or experience?
> A. No.
> Q. Okay. So despite all that, do you believe that you are qualified, based upon your experience as an independent adjustor, to go out, inspect and determine whether a building component has sustained damage due to a wind or rain event associated with a hurricane?
> A. Most building components, not all.
> Q. Okay. And quite frankly, that is pretty consistent for independent adjustors who do not have the technical expertise that we just talked about, because of their background, training and experience, can go out, can look at a building component and can arrive and reach a professional opinion as to whether that item should be repaired or replaced because of wind or rain damage associated with a hurricane, correct?
> A. Yes. (*Ocean View* Sansone Trial Testimony at pp. 150:11-151:14, attached as Exhibit F).

Mr. Sansone also testified as follows on direct examination as to the methodology he applies in adjusting and evaluating hurricane claims:

> "A. They asked me to adjust a claim on their behalf, inspect the building and conduct an adjustment of the claim.
> Q. And so, how did you go about doing that?
> A. I assigned an independent consultant inspector, Hazarie Khublal, to make contact with Ocean View and conduct an inspection.
> \* \* \*
> Q. So, he's instructed to go out and inspect the building and what is he supposed to be doing when he's out there?
> A. First of all, to request that the insured display their damage to him that they are aware of at that point in time and also is to look around other parts of the building that may have not been

> > displayed to him to see if there is any other damages he could observe.
> >
> > \* \* \*
> >
> > Q. So, what does he do once he starts to do his inspection?
> > A. He makes notes of what he is observing and what people are telling him.  He is taking measurements.  He is taking photographs.  (*Ocean View* Sansone Trial Testimony at p. 116:24-119:24).

When the methodology applied by Mr. Norcia in evaluating a hurricane loss is compared to the methodology invoked by QBE and its adjusters in evaluating a hurricane loss, it becomes patently obvious that Mr. Norcia's methodology is reliable.  It is difficult to understand how QBE can assert that Mr. Norcia's methodology is flawed when its own experts use virtually the same methodology.

Moreover, in this case, Mr. Norcia also relied upon the opinions of Dr. Anurag Jain, Ph.D. and Mr. Jeffery Dobbins as articulated in their reports.  Inherent in the fact that QBE has not brought a similar *Dabuert* style motion against Dr. Jain and Mr. Dobbins, QBE recognizes their expertise in the fields of engineering and glazing, respectively.  As discussed within his report, Mr. Norcia relied upon these expert reports in formulating his opinions in this case.  It is reasonable and customary in the property insurance industry for an adjuster or estimator to review, consider and rely on expert reports in estimating and adjusting a property insurance loss. (*See* Norcia Expert Report at p. 3, D.E. 59-3)

Here, it is disingenuous for QBE to argue that Mr. Norcia's testimony is not based on sufficient facts, data, and requisite experience, or that is the product of unreliable principles and methodology, when QBE's own adjusters have similar background, training and experience, and apply the same principles and methodology in formulating their own opinions.  In that regard, what is good for the goose is good for the gander.  Should this Court determine that Mr. Norcia

is unqualified to render opinions regarding repair or replacement, then QBE's witnesses should likewise be prohibited from offering such opinion testimony. With over 26 years of experience in adjusting property insurance claims, Mr. Norcia's methodology has been deemed acceptable and he has been allowed to provide expert testimony in both state and federal courts using the methodology he used in this case. (*See* Norcia's Curriculum Vitae and Testimony List).

### 3. Mr. Norcia's Expert Opinion Will Assist The Trier Of Fact.

In the event that the jury finds that QBE breached the insurance contract, the jury will be charged with determining Palm Bay's damages – in other words the replacement cost value and the actual cash value of the Palm Bay Hurricane Wilma loss. It is anticipated that the average juror will not have the background, training, education or experience to evaluate the replacement cost value and the actual cash value of Palm Bay's Hurricane Wilma loss. As such, they will need guidance from experts on this topic. Mr. Norcia's testimony will undoubtedly assist the trier of fact in this regard. Any purported weaknesses perceived by QBE in Mr. Norcia's testimony can be addressed during "vigorous cross-examination". Cross-examination will afford QBE with the opportunity to ferret out any alleged weaknesses to ensure that the jury properly evaluates the testimony's weight and credibility.

### C. A Daubert Hearing Is Not Necessary.

*Daubert* hearings are not required, but may be helpful in "complicated cases involving multiple expert witnesses". *U.S. v. Hansen,* 262 F.3d 1217, 1232-34 (11th Cir. 2001) *citing Tanner v. Westbrook,* 174 F. 3d 542, 546 (5th Cir. 1999). A party opposing experts should be granted a *Daubert* hearing when its motion includes conflicting literature and expert testimony. *Id.* A trial court does not abuse its discretion in denying a *Daubert* hearing where sufficient

information has been proffered to allow the court to evaluate the testimony's reliability. *See generally Cook v. Sheriff of Monroe County, Fl.*, 402 F.3d 1092 (11th Cir. 2009).

A *Daubert* hearing is not necessary in this case, as this is not a complicated case involving multiple experts. Moreover, through the course of this motion, this Court has been provided with sufficient evidence to evaluate the proffered testimony by Mr. Norcia and to determine that he is qualified to offer opinion testimony regarding property insurance loss valuation, including the repair and replacement of particular components.

### III. CONCLUSION

In sum, Mr. Norcia's opinion testimony should not be precluded. Mr. Norcia has the necessary background, training, and experience to qualify as an expert on property insurance loss valuation. His means and methods are reliable and, more importantly, are corroborated by QBE's own expert witnesses. Moreover, his testimony will assist the jury in this matter. Any purported weakness in Mr. Norcia's testimony goes to its weight rather than its admissibility, and should properly be addressed during cross-examination. Accordingly, this Court should deny QBE's motion and properly exercise its discretion in not conducting a *Daubert* hearing.

WHEREFORE Plaintiff, Bay Yacht Club Condominium Association, Inc., request that this Court (a) deny Defendant's, QBE Insurance Corporation, Inc., Motion to Exclude Opinion Testimony of Paul Norcia, (b) decline to conduct a *Daubert* hearing, and (c) enter and any other and further relief this Court deems just and appropriate.

Dated: February 2, 2012    Respectfully submitted,

By: /s/Christopher N. Mammel
Christopher N. Mammel, Esq., F.B.N. 54051
CHILDRESS DUFFY, LTD
12000 Biscayne Blvd., Suite 415
Miami, Florida 33181
Tel: (305) 895-9050
Fax: (305) 895-9589
cmammel@childresslawyers.com
*Attorney for Plaintiff, Palm Bay Yacht Club Condominium Association, Inc.*

**CASE NO. 1:10-cv-23685-JAL**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 2, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/Christopher N. Mammel
Christopher N. Mammel, Esq., F.B.N. 54051

## SERVICE LIST

*Palm Bay Yacht Club Condominium Association, Inc,*
*v.*

*QBE Insurance Corporation*

C. Deborah Bain, Esq.
dbainlaw@aol.com
C. Deborah Bain, P.A.
840 U.S. Highway One , Suite 305
The Summit Building.
North Palm Beach, FL 33408
Tel: 561-630-1917
Fax: 561-630-1918
*Co-Counsel for QBE Ins. Corporation*

Evelyn M. Merchant, Esq.
emerchant@berklawfirm.com
Gilberto J. Barreto, Esq.
gbarreto@berklawfirm.com
William S. Berk, Esq.
wberk@berklawfirm.com
Diana Carolina Lopez
Dlopez@berklawfirm.com
Berk, Merchant, and Sims, PLC
2 Alhambra Plaza, Suite 700
Coral Gables, Florida 33134
Tel.: (786) 338-2900
Fax: (786) 338-2888
*Co-Counsel for QBE Ins. Corporation*

Damian D. Daley, Esq.
ddalay@wickersmith.com
William F. Fink, Esq.
wfink@wickersmith.com
Wicker, Smith, O'Hara, McCoy and Ford, P.A.
515 North Flagler Drive
Suite 1600
West Palm Beach, FL 33401
Tel: (561) 689-3800
Fax: (561) 689-9206 (fax)
***Co-Counsel for QBE Ins. Corporation***